EARL WATSON MCCLURE, APPELLEE, V. WORLD INSURANCE COMPANY, APPELLANT.

FILED APRIL 13, 1934. No. 28880.

*Brome & Thomas* and *G. H. Seig,* for appellant.

*Brown, Fitch & West, contra.*

Heard before ROSE and PAINE, JJ., and LIGHTNER and THOMSEN, District Judges.

PAINE, J.

This is an action upon an accident insurance policy, procured by mail, wherein the plaintiff seeks to recover seven monthly instalments of $100 each, for the loss of his left foot by accident. At the close of all the evidence, the trial court, upon his own motion, instructed the jury to return a verdict for the plaintiff in the amount claimed.

The appellant insurance company admits the issuance of a special income guarantee policy in the sum of $5,000, for an annual premium of $15, which provided for the payment of one-half the principal sum for the loss of one foot by an automobile accident, said sum of $2,500 to be payable in monthly instalments of $100 each, and alleges that, by reason of fraud and misrepresentation,

the plaintiff is not entitled to any payment, but that said defendant company is willing to repay to the plaintiff the premium paid by him for the policy.

The defendant insurance company is located in Omaha, and secures its business largely by sending out printed postal cards and sample policies to prospects. The plaintiff filled out such a card on March 13, 1930, which was received by the defendant April 21, 1930, and set out on such card that he was born May 28, 1887; age, 43; height, 5 feet 5 inches; weight, 150 pounds; race, white; that Georgia M. McClure, his wife, was beneficiary; that his address was Dawson Springs, Kentucky; and then followed this paragraph: "My habits are correct and temperate. I am in good health and free from any infirmity. My income exceeds my combined disability insurance, including benefits hereby applied for. I have not been postponed, canceled or rejected, or requested to pay an abnormal rate for insurance except by (followed by one and a half blank lines in which Dr. McClure had written 'Declined by Metropolitan, 1930, March')." When this post card application was received by the company, two policies were sent him, with a bill, one being an accident policy and one a health policy. These policies remained upon his office table until June 25, 1930, when he wrote them a letter, which, omitting the formal parts, reads as follows:

"The policy sent me a few months ago was destroyed by mistake and thrown into waste basket, the fragments afterwards partially recovered.

"I filled out this application early in the year and subsequently decided not to mail it. Instead I made application to the Metropolitan for a health and accident policy for $75 weekly indemnity and was rejected. This seemed unjust and unfair to me. I was informed thru the agent that the Business Mens Credit Ass. has given me a poor rating—a probable cause. There is an account or two pending which I prefer to settle thru the courts. However my local credit is good and I can refer you to the

First National or Commercial Bank of this city for verification.

"This application card must have been mailed to you subsequently by my office girl. I had no intention of mailing it.

"In perusing the fragments it looks as if you are offering a considerable amount of protection for so small a fee.

"I have no desire to again be refused or rejected. It will be necessary for me to make application again, and if you care to investigate this matter I will file application if I have reasonable assurance of obtaining a contract."

The defendant company wrote the plaintiff a letter on July 7, 1930, which, omitting the formal parts, reads as follows:

"This will acknowledge receipt of your kind letter of June 25 regarding the policy we sent for your inspection and approval.

"Our records appertaining to the previous policy issued to you have been marked canceled, but we have completed a new policy of the same identical form and have also issued you a health policy providing $100 monthly benefits.

"From the way we look at it, you ought to be financially able to carry these policies if you want to, and we are very little concerned in your local credit rating. Evidently you are making a living and you need insurance, and unless your income is insured in excess of its actual worth, we are not further interested in your personal affairs."

The insurance company contends that they rely entirely upon the statements made in such post card applications, and thus avoid the expense of a medical examination, and if false statements are made in the post card application the policy is void, and contend they are not liable for the accident in question because plaintiff's statements upon the post card, "I am in good health and free from any infirmity," and that he had not been rejected by any company except the Metropolitan, are false.

The defendant company bases its claim that he had an infirmity which he concealed from them upon the following facts, shown by the evidence: While Dr. McClure, the plaintiff, was practicing his profession in Cleveland, Ohio, upon December 20, 1925, he was standing in a garage where a mechanic was using a can of gasoline to wash off grease, and by an accident the can of gasoline was spilled over the plaintiff's clothes, and instantly ignited from a cigar which he held in his hand, and instantly he was in flames. Before he could get his burning clothes off, his ankles were burned severely. He remained in a hospital less than two weeks, but was treated for these burns for eight or nine months. The denuded area finally healed over with natural skin, without grafting, but left scars on his ankles. Defendant claims that this scar tissue constituted an infirmity, material to the risk, in that it made the muscles of his feet weaker. This in spite of the fact that the plaintiff said it did not affect him in any way; that he could dance, and indulge in hunting and outdoor sports. They also charge that he concealed the fact from them that he had been paid $2,000 by the National Casualty Company for such burns, and that they canceled his accident insurance; that he also concealed that he had been rejected by the Standard Accident Insurance Company.

Taking up these objections in the inverse order, the evidence discloses that he applied to the Standard Accident Insurance Company for a policy through an agent, and signed up an application in blank, and the agent later filled in the answers in the absence of plaintiff; that, upon receipt of the policy, plaintiff noticed that two answers had been omitted, one being that the agent had not shown plaintiff's rejection by the Metropolitan. The policy was returned, and this omission had been corrected in the second policy received. Plaintiff testifies he then wrote the company direct, returning the policies, and telling them of additional corrections to make in the application. The company never replied to this letter. He was not

notified that they refused to insure him or had rejected him.

In regard to the National Casualty Company, carrying an accident policy on plaintiff at the time he was burned, they paid his entire claim, as made, of $2,000, and he surrendered his policy in the settlement. The mere statement of the facts clearly shows that it was not a rejection of an application for insurance in any way, but that a claim was paid in full and the policy taken up.

We now come to a discussion of the most serious question presented to us: Did the plaintiff make a false and fraudulent statement which voids the policy when he signed exhibit No. 8, the post card application, dated March 13, 1930, which had printed in it a line in small type, reading, "I am in good health and free from any infirmity?" We note that the exhibit had across it the words, "Not taken Jul. 3—1930," as the first policy written was canceled.

The new Oxford Dictionary gives, as one definition of infirmity: "Physical weakness, debility, frailty, feebleness of body, resulting from some constitutional defect, disease, or (now mostly) old age;" and another definition is: "Weakness or want of strength; lack of power to do something; inability."

The word "infirmity" is also defined in the first syllabus in *Black v. Travelers Ins. Co.,* 121 Fed. 732, 61 L. R. A. 500, as: "A bodily infirmity is something that materially impairs the bodily powers, and to constitute a breach of a warranty against the existence of it there must be something that amounts to an actual inroad on the physical health or condition."

Now, the insurance company claims that these scars, constituting a concealed infirmity, contributed to this plaintiff's injury. What are the facts?

Plaintiff testified that he had lived at Dawson Springs, Kentucky, since March, 1928; had practiced general medicine and surgery for 12 years. That on March 7, 1931, the date of the accident, he was attending to his usual

practice; that his family was out at a card party. His brother had been visiting him from Omaha for two weeks. Then he testifies generally, condensing his statements as follows: When we came home from the card party I had one or two calls to make. I started out about 11:30. My brother was with me. He is 34 years old. I started to see a sick lady residing about five miles in the country. It was raining very hard. I was driving a Chevrolet. After taking care of the patient we started back to town. My brother drove on the way back. It was still raining very hard. The roads were filled with water, and disagreeable. The road was hard in the center, soft on the edges. There was a curved road, lined with willows, and a fill about 30 feet high leading to a bridge. Visibility was very poor. I could see nothing on my side. My brother could see, because the windshield wiper was going on his side. I felt that we were in soft dirt and were going over the bank, so I started to make a jump. I got my feet out of the door. I do not know what happened, but we turned over, and I presume the door shut on my feet. I was stunned or unconscious. I reached down and I got a spurt of blood on my hand, and realized that an artery had been broken. I grabbed hold of it to keep from bleeding to death, which would have occurred in ten minutes. It was very dark. I called to my brother. I told him to get a strip of a rubber tube in the car and help me tie it around my leg. The car was upset, everything stirred around, and it took him some time to find the tube. I was out on the ground at the bottom of the 30-foot embankment. I then knew I had both legs broken and was bleeding badly from both legs. He helped put the tourniquet on, and we tied it as tight as we could, and I then sent him home, about a mile and a half, after he had carried me up on this embankment. It was very dark, and about a quarter to one. My brother went and got my wife and brought her out in a car. I was sitting there in the rain, with both legs broken, and in severe pain. One car went by. I

tried to flag it, but they would not stop. My wife and brother came back with a car, and, stopping at home, called a doctor, who gave me first aid, and then I was taken right on to the hospital at Hopkinsville. Both of my legs were broken; that is, the two bones between the ankle and the knee, the tibia and fibula, were both broken in the right leg, and one in the left leg. It was 47 miles to Hopkinsville. We arrived there about 3 or 4 o'clock in the morning. I was about unconscious, and was delirious most of the way down from the loss of blood. I remained in the hospital about six weeks. On March 30 they amputated my left leg, and I am now wearing an artificial foot and limb. The leg was taken off at the lower one-third. It is a 9½ inch stump below the knee. My wife notified the defendant insurance company of the accident. On March 19, 1931, they mailed blanks for proof of loss.

Defendant relies upon the case of *Morrissey v. Travelers Protective Ass'n*, 122 Neb. 329. In that case the question was asked, "Is your eyesight impaired?" A member of the association was seeking his application, and such member knew that he had a cataract on his left eye, and he told the member seeking the application, and asked what the answer should be, and the agent member of the association said, "Since you can see all right, the answer should be 'No.'" About a month after the issuance of the policy, the plaintiff met with an accident when, in getting out of an automobile at Tecumseh late in the evening, he hit the back of the seat with the lens over his right eye, part of the broken lens injuring the eye, and requiring its removal. In that case, the fact concealed and misrepresented was the main contributing cause to the accident. In this case a small spot of scar tissue on the ankle was not, and could not be, a contributing cause to getting his legs caught in the door when the car was falling over an embankment, and having them broken off, and the two cases are not parallel.

The defendant company, in refusing payment of the

claim, stated two grounds in their letter of June 5, 1931, for not paying: First, that he had surrendered a policy after the company had paid large amounts for his burns; and, next, that he was suffering an infirmity as a result of said burns. •They cannot, after litigation has begun, "mend their hold" and now rely upon his rejection by other companies. *Yates v. New England Mutual Life Ins. Co.*, 117 Neb. 265; *Continental Ins. Co. v. Waugh,* 60 Neb. 348.

In the case of *Mutual Life Ins. Co. v. Dodge,* 11 Fed. (2d) 486, a wife sought to collect a double indemnity of $10,000 attached to a life insurance policy, which provided that the accident insurance was not payable if death resulted from bodily infirmity. The death was caused by paralysis of the respiratory center, caused by the administration of novocaine preliminary to an operation for the removal of tonsils. Medical experts testified that the deceased had an idiosyncrasy, or hypersusceptibility, to novocaine, and the insurance company contended that this exceedingly rare condition was a bodily infirmity, but the court refused to accept this contention.

4 Couch, Cyclopedia of Insurance Law, sec. 885f, says: "The test ordinarily is as to whether or not a particular injury was serious, and such as tended permanently to impair the applicant's health or adversely affect his normal span of life, it being quite generally held that injuries which do not so result are not material to the risk. * * * So, a gunshot wound in the back of the head which does not affect insured's general health, which is uniformly good, does not falsify a warranty by him that he had never had any bodily or mental infirmity." See, also, *Black v. Travelers Ins. Co., supra; Grangers' Life Ins. Co. v. Brown,* 57 Miss. 308, 34 Am. Rep. 446; *Transylvania Casualty Ins. Co. v. Paritz,* 184 Ky. 807.

In *Royal Neighbors of America v. Wallace,* 73 Neb. 409, this court held that an incorrect or untrue answer in an application for insurance, in reference to matters of opinion or judgment, will not avoid the policy, if made in

good faith, and without intention to deceive, and, in our opinion, the burden is upon an insurer to show, by clear, cogent, and convincing proof, that insured's representations in his application were false. *Equitable Life Assurance Society v. Dunn*, 61 Fed. (2d) 450.

In our opinion, the statement relating to an infirmity was not a false representation which defeated a recovery. In fact, the evidence is convincing that insured was without infirmity, and that the scar tissue at his ankles gave him no trouble and did not affect his manner of life, nor did it contribute in any way to the fracture of his legs, or the amputation necessitated by the fracture.

There being no prejudicial error in the record, the judgment of the trial court is affirmed, and an attorney's fee of $200 allowed in this court.

AFFIRMED.