## Gyulai *v.* Prudential Insurance Company of America, Appellant.

**74**

Argued October 14, 1938. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES,
JJ. ▮▮▮▮▮▮

*Kendall H. Shoyer,* with him *Frederick J. Shoyer*
and *Andrew C. Dana,* for appellant.

*Edwin A. J. Blank,* for appellee.

OPINION BY CUNNINGHAM, J., March 16, 1939:

The plaintiff below and appellee herein sued to re-
cover from the defendant insurance company the addi-
tional "Accidental Death Benefit" of $1,000 it had
agreed by its insurance contract upon the life of her

husband, Vincent Gyulai, to pay "upon receipt of due proof" that his death, which occurred on October 5, 1936, "resulted" from a "bodily injury" sustained, within the preceding ninety days, "solely through external, violent and accidental means." The defense was that the insured's death "resulted from disease or bodily infirmity." The trial of this issue on January 12, 1938, before BONNIWELL, J., sitting without a jury, resulted in a finding for the plaintiff; defendant's motions for judgment, n. o. v., or a new trial, were denied and it has appealed from the judgment entered upon the finding.

The only testimony presented at the trial was that by and on behalf of the appellee. It may be thus summarized:

While at work on September 25, 1936, the insured, forty years of age and apparently in good health, was struck on the head by a falling board. He was taken to a hospital where the wound was treated, two sutures were inserted and he was given an anti-tetanus injection. He returned to work and stayed until the end of the day. At home that evening he suffered a hemorrhage from his mouth and nose and was again taken to the hospital. He returned home the following day, but went to another hospital where he died ten days after the injury. The cause of death was determined by the coroner's physician, Dr. Martin P. Crane, who made an autopsy, to be acute nephritis, kidney ailment. This kidney condition was attributed to a particular sensitivity described as an "anaphylactic reaction" to the anti-tetanus serum.

As to the cause of insured's death Dr. Crane testified: "The result of the autopsy showed that this man had first an injury of his head; second an early broncho-pneumonia at the bases of his lung; third, an acute— what was in essence an acute nephritis with renal shut-down—renal failure, anuria and death. Q. What was the cause of anuria, the renal shut-down, the broncho-

pneumonia and the other?......A. In my opinion this man had had an injury to his head [for] which he was treated in a perfectly justifiable manner. In other words, he received not only local treatment but an injection of material calculated to prevent him from possible tetanus. Unfortunately, he developed respiratory symptoms ...... Q. And what did you decide was the cause of death? A. I decided the cause of death was renal failure, the result of acute nephritis subsequent to some undue sensitivity or allergic manifestation following treatment for an injury. Q. Dr. Hayes, who just left the stand, testified that he gave Mr. July an injection of antitoxin serum about noon on September 25, 1936, and put two sutures in the wound on his scalp. In your opinion, is there any connection between the injury sustained on September 25, 1936, and his death on October 5, 1936? A. Well, I feel that the chain of circumstances—I cannot help but believe that it is intact. In other words, the injury resulted in justifiable treatment to which this patient had a very unusual sensitivity and suffered a fatal reaction."

Counsel for appellant complain in one of their assignments of the admission, over their objection, of the following testimony: "By Mr. Blank (counsel for appellee): Q. Mr. Shoyer (counsel for appellant) has been using the words 'kidney disease' all the way through. Was there any evidence in these kidneys of disease other than from this anaphylaxis that you testified to? Mr. Shoyer: He said he could not find any evidence as the cause of this condition. I object. (Objection overruled.) (Exception for defendant.) A. Well, there was no evidence of any other process other than the one in which I testified to. In other words, without a history, as I said before, I would not have been able to account for this man's acute renal symptoms."

The objection was to the reference by Dr. Crane to the "history" of the case. The witness had just heard

Dr. Merrill B. Hayes of the Episcopal Hospital testify in great detail to the reception of the insured at that hospital immediately after the accident the extent and treatment of the wound in his head, and the injection of the tetanus antitoxin. The facts upon which the opinion of the witness was based were of record; we think the testimony was properly admitted.

The present contract did not contain the provision found in many similar contracts that "no accidental death benefit will be paid if the death of the insured . . . . . . is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity . . . . . ." Appellant, however, in reply to the allegation in the eleventh paragraph of appellee's statement that the injuries inflicted upon the head of the insured by the falling plank resulted in his death, specifically averred in its affidavit of defense that the death "resulted from disease or bodily infirmity." No evidence was offered by appellant; it relied upon its contention that appellee failed to meet the burden placed upon her by the general terms of the contract and the pleadings.

For the purposes of this appeal we assume appellee had the burden of proving by competent evidence, to the satisfaction of the trial judge: (a) that the death of the insured resulted from the sustaining by him of bodily injuries through external, violent and accidental, means; and (b) that it was not attributable to any "disease or bodily infirmity" with which he was afflicted: *Lubowicki v. Metro. Life Ins. Co.,* 114 Pa. Superior Ct. 596, 599, 174 A. 649; *Cockcroft v. Metro. Life Ins. Co.,* 125 Pa. Superior Ct. 293, 297, 189 A. 687; *Lederer v. Metro. Life Ins. Co.,* 135 Pa. Superior Ct. 61, 4 A. 2d 608.

As to any specific disease, Dr. Crane testified positively: "He (decedent) did not have any disease in the kidney that would indicate long standing." The inquiry, therefore, is whether the abnormal physical con-

dition of the insured which resulted in the anaphylactic reaction to the injection of the anti-tetanus serum was such a bodily infirmity as to bar recovery in this case. Even if it be conceded that the insured's death would not have resulted from the injury inflicted upon his head if he had not been hypersensitive to the effects of the injection, it does not follow that there can be no recovery.

We are not without authority upon the question of the construction to be given the term "bodily infirmity" in cases of the nature of the one with which we are now concerned. The case of *Arnstein v. Metropolitan L. Ins. Co.*, 329 Pa. 158, 196 A. 491, involved a death from streptococcic septicemia. There the insured had an ingrown toenail partially removed by a chiropodist and subsequently applied heat rays to his foot in order to heal it. He fell asleep on one occasion and the exposure to the lamp resulted in a severe burn on the instep. A blister developed and a fatal infection set in. Though it was shown the insured had been suffering from diabetes, the trial judge, sitting without a jury, found as a fact that the diabetes did not contribute to the death. The defense was then raised that death was due to a bodily infirmity consisting of the ingrown toenail and the wound caused by its removal. In dismissing this argument Mr. Justice STERN, speaking for the Supreme Court said: "The latter term (bodily infirmity) in insurance policies has uniformly been construed to mean a condition of a settled and substantial character materially impairing the bodily processes, and not to cover minor physical defects and ailments which are frequent incidents of life, speedily forgotten, and not affecting the general soundness and healthfulness of the system. Even a dormant duodenal ulcer has been held not to be a disease or bodily infirmity within the meaning of those terms in a policy: *Silverstein v. Metropolitan Life Insurance Co.*, 254 N. Y. 81, 171 N. E. 914. The same has been ruled in regard to

burns about the ankles, leaving scar tissue: *McClure v. World Ins. Co.*, 126 Neb. 676, 254 N. W. 393; and to intestinal adhesions resulting from a hernia operation: *Druhl v. Equitable Life Assurance Society* 56 N. Dak. 517, 218 N. W. 220. An ingrown toenail no more constitutes 'bodily infirmity' than would an impacted tooth."

The language of the late Mr. Justice CARDOZO, when speaking for the New York Court of Appeals in *Silverstein v. Metropolitan Life Insurance Company*, 254 N. Y. 81, 171 N. E. 914, cited in the Arnstein case, demonstrates that the disease or infirmity which will defeat recovery of accidental death benefits must be something that would be so designated in the common speech of the average layman. This is the case in which the question whether a duodenal ulcer amounted to a physical infirmity was submitted to a jury. In the course of the opinion it was said:

"In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men. ...... A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules.

"A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency. ...... A recovery will not be denied to the sufferer from hernia

who has had a predisposition to rupture because the inguinal canal was not closed as it ought to have been ......, or to one whose hip has been fractured because his bones have become brittle with the advent of old age ...... 'If a man with an abnormally thin skull be struck a blow which would not seriously injure a normal man, but which causes his death, it is perfectly plain that the cause of death is not the thinness of the skull, but the receipt of the blow' ...... The governing principle has been stated by RUGG, C. J., with clearness and precision: 'If there is no active disease, but merely a frail general condition, so that powers of resistance are easily overcome, or merely a tendency to disease which is started up and made operative, whereby death results, then there may be recovery even though the accident would not have caused that effect upon a healthy person in a normal state.' (Leland v. U. C. Travelers, 233 Mass. 558, at p. 564). An ulcer as trivial and benign as an uninfected pimple, is at most a tendency to an infirmity, and not an infirmity itself."

It is no more to be expected that all applicants for insurance possess identical powers of resistance and degrees of sensitivity to antitoxins than that their skulls are all of the same thickness or their arteries of the same flexibility. A comparable case is Neely et al. v. The Provident Life and Accident Insurance Co., 322 Pa. 417, 185 A. 784. There a physician accidentally got a piece of glass in one of his fingers. A recovery was sustained in an opinion by Mr. Justice MAXEY, in the course of which he said: "Defendant contends that although the injury to the finger may have been accidental, the probing of the wound by Dr. Neely was an intentional and injurious act. The answer is that if an accident to the finger started the sequence of events which terminated fatally, the company would be liable under these policies even though the treatment invited by the trauma contributed to the fatal result. If the insured met with an accident to his finger, the probing

of the wound, done admittedly by him, was a natural and probable result, and this probing though a *concurring* cause of death, would not bar plaintiffs' recovery, for the accident was the *proximate* cause."

See also *Jones v. Commonwealth Casualty Co.*, 255 Pa. 566, 100 A. 450; *Kelley v. Pittsburgh Casualty Co.*, 256 Pa. 1, 100 A. 494, (where an abnormal sensitivity to the effects of a fall existed) ; and *Dale v. Standard Accident Ins. Co.*, 307 Pa. 398, 161 A. 307.

Reliance is placed by appellant on *Hesse v. Traveler's Ins. Co.*, 299 Pa. 125, 149 A. 96. There the insured died suddenly and unexpectedly as an operation for the removal of a diseased kidney was being completed. Admittedly his death was "an anaesthetic death, due to the hypersusceptibility of the particular individual to the particular anaesthetic." Our Supreme Court in a four to three decision affirmed the refusal of the trial court to take off a judgment of nonsuit in an action upon policies which insured "against loss resulting from bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means." The conclusion reached in the majority opinion was placed upon the following ground: "Even if we assume that the operation was a bodily injury within the meaning of the policy, we have it admitted that the insured's death did not result from the operation, but solely from the anaesthetic, neither the administration nor the effect of which could possibly be a bodily injury, certainly not, under the facts above recited, a bodily injury 'through ...... accidental *means.*' There were no accidental means, all those employed were intentional."

The case at bar is readily distinguishable upon its facts. In the Hesse case the administering of the anaesthetic—a matter comparable with the giving of the injection in this case—was not merely a link in a chain of circumstances which began with an accidental injury to the physical structure of the body.

The plaintiff in that case did not show any previous accident requiring or justifying the administration of the anaesthetic.

Here, we have a chain of events consisting of four links: First, the accidental blow on the head; second, the injection of antitetanus serum as a part of the treatment; third, the existence of the hyper sensitivity to this serum; and fourth, the fatal nephritis, caused by the sensitivity to the treatment.

As above shown, the trial judge could find that the hyper-sensitivity was not a disease or bodily infirmity, within the common acceptation of those terms; of itself, it would never have even inconvenienced the insured; its existence would never have been discovered if the serum had not been injected; and the serum would not have been injected if the insured had not suffered the accidental injury to his head.

If the testimony upon this record be accepted as credible, any fact finding tribunal could reasonably conclude therefrom that the accident relied upon by the appellee was the cause of the death of the insured. The trial judge having so found, we see no reason for disturbing the judgment.

Judgment affirmed.