Florence **BROWARSKY**, now Florence Lipscher, and Joseph Browar, Executors and Trustees under the Last Will and Testament of Harry Browarsky, Deceased, and The Estate of Harry Browarsky, Deceased, Plaintiffs,

v.

Stanley **GRANGER**, Collector of Internal Revenue, Defendant.

Civ. A. No. 10783.

United States District Court
W. D. Pennsylvania.
Oct. 29, 1956.

Leonard Boreman, of Boreman, Parker, Krause & Horwitz, Pittsburgh, Pa., for plaintiffs.

D. Malcolm Anderson, Jr., U. S. Atty., Thomas Shannon, Asst. U. S. Atty., Pittsburgh, Pa., Arthur Biggins, Kenneth Ray, Special U. S. Attys., Dept. of Justice, Tax Division, Washington, D. C., for defendant.

MARSH, District Judge.

In this action plaintiffs seek to recover additional estate taxes which they assert were erroneously assessed against and collected from them. From the testimony presented, the court makes the following

### Findings of Fact

1. Plaintiffs, Florence Browarsky, now Florence Lipsher, and Ike Browarsky were duly appointed and qualified as the Executors and Trustees under the Last Will and Testament of Harry Browarsky, deceased, and the Estate of Harry Browarsky, deceased. On April 19, 1954, Ike Browarsky, Co-Executor and Co-Trustee of the decedent's estate, died, and on June 1, 1954, pursuant to the decedent's Last Will and Testament, Joseph Browar qualified as substitute Co-Executor and Co-Trustee. On November 30, 1955, the said Joseph Browar was substituted as a party plaintiff in lieu of Ike Browarsky, deceased.

2. The defendant, Stanley Granger, was at all material times the Collector of Internal Revenue in and for the Western District of Pennsylvania.

3. This suit arises under the provisions of the United States Internal Revenue Code.

4. On April 15, 1947, Harry Browarsky, a resident of the City of Pittsburgh, Allegheny County, Pennsylvania, died in Cleveland, Ohio. On May 3, 1947, his Last Will and Testament was duly probated, and Letters Testamentary were granted on his estate by the Register of Wills of Allegheny County, Pennsylvania.

5. On July 7, 1948, the executors filed a federal estate tax return in the estate of Harry Browarsky, deceased, with the Collector above named, and paid to him the sum of $65,516.04, the amount of tax determined on the aforementioned estate tax return.

6. Subsequently, the Commissioner of Internal Revenue computed decedent's gross estate at $459,819.09 and determined that a deficiency in the sum of $33,952.02 was due and owing by the executors as additional federal estate tax.

7. On August 28, 1950, the executors paid to defendant the sum of $12,321.94 on account of the asserted deficiency, and on October 19, 1950 the executors paid to the defendant the sum of $26,127.37, which consisted of the principal balance due on the deficiency and interest due thereon.

8. On July 31, 1951, the executors filed with the Commissioner of Internal Revenue a timely claim for refund which included all estate taxes assessed against the estate by reason of the inclusion among the assets of the estate of certain United States Savings Bonds standing in the name of the decedent's two minor daughters.

9. On March 3, 1952, the Commissioner of Internal Revenue rejected the claim for refund.

10. On November 25, 1934, the decedent and Florence Browarsky, now Florence Lipscher, were married. Two children were born of this marriage—Rachel Sandra on September 24, 1936, and Benita, on August 10, 1940. The marriage was terminated by the death of the decedent.

11. At the time of the decedent's death on April 15, 1947, Rachel Sandra Browarsky, one of the decedent's minor daughters, was the owner of the following United States Savings Bonds:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 3 | $1,000 each | D | March 1, 1941 | $2,580.00 |
| 4 | 100 each | D | March 1, 1941 | 344.00 |
| 3 | 100 each | E | September 1, 1941 | 255.00 |
| 5 | 100 each | E | December 1, 1941 | 420.00 |
| 3 | 100 each | E | February 1, 1942 | 252.00 |
| 3 | 100 each | E | April 1, 1942 | 252.00 |
| 3 | 100 each | E | May 1, 1942 | 249.00 |
| 1 | 1,000 | E | September 1, 1943 | 810.00 |
| 1 | 1,000 | F | January 1, 1944 | 760.00 |
| | $7,100 | | | $5,922.00 |

12. Of the bonds listed in Finding No. 11, the following bonds, having a total face value of $2,400 and a total redemption value of $1,983 were purchased by the decedent's brother, Ike Browarsky, with his own funds in the name of his niece, Rachel Sandra Browarsky, as gifts to said niece:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 5 | $ 100 each | E | December 1, 1941 | $ 420.00 |
| 3 | 100 each | E | February 1, 1942 | 252.00 |
| 3 | 100 each | E | April 1, 1942 | 252.00 |
| 3 | 100 each | E | May 1, 1942 | 249.00 |
| 1 | 1,000 | E | September 1, 1943 | 810.00 |
| | $2,400 | | | $1,983.00 |

13. Of the bonds listed in Finding No. 11, the following bonds, having a total face value of $3,400 and a redemption value of $2,924 were acquired with moneys from the estate of Ben Browarsky, another brother of decedent and were not included in the decedent's estate for tax purposes:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 3 | $1,000 each | D | March 1, 1941 | $2,580.00 |
| 4 | 100 each | D | March 1, 1941 | 344.00 |
| | $3,400 | | | $2,924.00 |

14. Of the bonds listed in Finding No. 11, the following bonds, having a total face value of $1,300 and a redemption value of $1,015, were purchased by the decedent, Harry Browarsky, and placed in the name of his daughter, Rachel Sandra Browarsky:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 3 | $ 100 each | E | September 1, 1941 | $ 255.00 |
| 1 | 1,000 | F | January 1, 1944 | 760.00 |
| | $1,300 | | | $1,015.00 |

15. At the time of the decedent's death on April 15, 1947, Benita Browarsky, one of the decedent's minor daughters, was the owner of the following United States Savings Bonds:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 3 | $ 100 each | E | September 1, 1941 | $ 255.00 |
| 5 | 100 each | E | December 1, 1941 | 420.00 |
| 3 | 100 each | E | February 1, 1942 | 252.00 |
| 3 | 100 each | E | April 1, 1942 | 252.00 |
| 3 | 100 each | E | May 1, 1942 | 249.00 |
| 15 | 100 each | E | October 1, 1942 | 1,245.00 |
| 1 | 500 | E | September 1, 1943 | 405.00 |
| 1 | 1,000 | F | January 1, 1944 | 760.00 |
| | $4,700 | | | $3,838.00 |

16. Of the bonds listed in Finding No. 15, the following bonds, having a total face value of $1,900 and a total redemption value of $1,578 were purchased by the decedent's brother, Ike Browarsky, with his own funds in the name of his niece, Benita Browarsky, as gifts to said niece:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 5 | $ 100 each | E | December 1, 1941 | $ 420.00 |
| 3 | 100 each | E | February 1, 1942 | 252.00 |
| 3 | 100 each | E | April 1, 1942 | 252.00 |
| 3 | 100 each | E | May 1, 1942 | 249.00 |
| 1 | 500 | E | September 1, 1943 | 405.00 |
| | $1,900 | | | $1,578.00 |

17. Of the bonds listed in Finding No. 15, the following bonds, having a total face value of $2,800 and a total redemption value of $2,260 were purchased by the decedent, Harry Browarsky, and placed in the name of his daughter, Benita Browarsky:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 3 | $ 100 each | E | September 1, 1941 | $ 255.00 |
| 15 | 100 each | E | October 1, 1942 | 1,245.00 |
| 1 | 1,000 | F | January 1, 1944 | 760.00 |
| | $2,800 | | | $2,260.00 |

18. Between November 1, 1945, and September 1, 1946, the decedent purchased the following United States bonds and placed them in the joint names of his two minor daughters, Rachel Sandra Browarsky and Benita Browarsky:

| No. | Face Value | Series | Issue Date | Redemption Value |
|---|---|---|---|---|
| 5 | $ 1,000 each | E | November 1, 1945 | $ 3,800.00 |
| 3 | 100 each | E | September 1, 1946 | 225.00 |
| 3 | 100 each | E | September 1, 1946 | 225.00 |
| 10 | 5,000 each | F | January 1, 1946 | 37,100.00 |
| | $55,600 | | | $41,350.00 |

19. Throughout the war period and shortly thereafter, decedent purchased jointly for himself and his daughter, Rachel Sandra, United States savings bonds of the face value of $21,000; he purchased jointly for himself and his daughter, Benita, United States savings bonds of the face value of $31,000, of which $8,000 were purchased in September, 1946, at the time he purchased bonds of the face value of $600 in the joint names of his two children.

20. During the war period, Ike Browarsky purchased United States savings bonds of the face value of $100,000 for the partnership in the joint names of decedent and himself.

21. The decedent, until his death at the age of 47, was actively engaged in business with his brother Ike Browarsky. They owned real estate and stocks, and each actively managed a moving picture theater. Each theater was incorporated; the brothers owned all the stock. The profits from these corporations, the rents from real estate and the dividends from shares of stock held in approximately 23 other corporations were apparently received by the brothers as partners. Ike was the dominant partner and managed the partnership funds.

22. The purchase of $50,000 of United States savings bonds made on January 7, 1946 in the joint names of the daughters, at a cost of $37,000, was made under the following circumstances: On October 30, 1945 decedent and his brother-partner, Ike Browarsky, had a disagreement; decedent resented the fact that Ike dominated him and the business; each accused the other of obtaining more than his share of the partnership funds. As a result, the bonds and stocks of the partnership were divided between them. Decedent redeemed his share of the bonds of the face value of $50,000 on January 3, 1946, the proceeds being $37,-470, and on January 7, 1946 made the purchase aforesaid in the names of his daughters.

23. Throughout the war period and shortly thereafter, decedent purchased bonds in the names of his children, individually and jointly as above set forth, to insure their education and maintenance. His decision to place the $50,000 savings bonds in the names of his children was motivated principally by his apprehension that if he retained the bonds in his own name, they would be dissipated to satisfy what he considered to be extravagant demands of his wife.

24. The bonds in question remained in decedent's possession until his death; neither his wife nor his children had knowledge thereof until after his death.[1]

25. Decedent was afflicted with polycythemia rubra vera, possibly since 1936 and probably since 1939 (plaintiffs' Exhibit G).

26. Polycythemia vera is a fatal disease of the blood. The disease involves

---

1. Both sides have treated the bonds purchased in the individual and joint names of the children as being completed gifts or as transfers consummated prior to death.

an overstimulation of the blood-making elements of the body, causing an increase in the volume of blood circulating in the body and an elevation of both the red and white blood cells. Over a period of time, this overstimulation and increased volume of blood leads to complications of the circulatory system and heart. These complications are usually the cause of death. Decedent died unexpectedly of a coronary thrombosis resulting from one of the usual complications of polycythemia vera.

27. The average life expectancy of one afflicted with polycythemia vera is 10 years; some persons live over 20 years after its onset.

28. Decedent was aware that he was so afflicted probably as early as 1941 and certainly since 1944 (defendant's Exhibit 4, p. 10), but he did not know that the disease was fatal or that his death was imminent. On the contrary, the evidence is persuasive that at worst he thought his case was mild or under control, and that he might live 20 years or more; at best he thought the diagnosis of polycythemia vera was doubtful. His family doctor testified he thought decedent had erythrocytosis, a non-fatal disease, and so advised him (T., p. 172). When the bonds were purchased for his daughters, decedent did not believe that his death was imminent; on the contrary, there was much to put his mind at ease (T., pp. 178, 179, 187).

29. In 1936 decedent knew he was ill and was examined at the Cleveland Clinic. He complained of an urinary irritation and of being fatigued. He was found to have excessive red and white blood cell counts. In July, 1939, decedent continued to display excessive red and white blood cells, fatigue and a slight rise of temperature at night. In 1944 there was evidence of myocardial damage, coronary artery disease and an old arterio-lateral myocardial infarction. In October, 1946, it was noted that he had congestion of the coronary arteries, an enlarged heart and a slightly enlarged liver. He suffered a hemorrhage from the throat or esophagus in December of 1946. This hemorrhage was the only confining illness, other than colds, which decedent had since his marriage in 1934 and the confinement was only for a period of about two weeks. Maintenance doses of digitalis were prescribed off and on since 1944.

30. During the period from November, 1945 through September, 1946, when the joint bonds were purchased, decedent's bodily condition was precarious and deteriorating, but his mental condition, if anything, had improved. At all times after 1941, Dr. Haden, when called upon to express an opinion, stated his satisfaction with decedent's physical condition (defendant's Exhibit 4, pp. 10–12) since the disease was never very marked (plaintiffs' Exhibit G). After 1941, decedent ceased to rush to the Cleveland Clinic every few months as he had been doing and as he had been advised to continue; his local doctors, principally Dr. Goldstein, managed his disease. Until his death, he worked regularly for 10 or 11 hours a day, engaged in frequent social activities, smoked heavily, and played golf on occasion; his appearance was that of a healthy robust man.

31. During the period from November, 1945 through September, 1946, his state of mind was not one of concern with death but with living; he did not contemplate imminent death. The principal motive which induced the large purchase in January, 1946 was the desire to insure the welfare and education of his children whether he lived or died. The picture presented, then, is that of an average man in his early 40's, busily engaged in carrying on his business, contemplating new ventures, and participating in an active social life in accordance with his desires and social standing. During that period he carried on his business, family and social life as if he expected to live for many years to come.

32. In October, 1946, after all the bonds in question had been purchased, it appears that both Mr. and Mrs. Browarsky became apprehensive of decedent's health and aware that he was in a very precarious situation, but even then it

does not appear that decedent thought his death was imminent nor was he told that it was by any medical advisor.

33. Over a period of 7 or 8 years prior to his death, decedent had made four or five wills as changing events occurred, the last being dated March 7, 1946, the next to the last will was dated October 31, 1945. The scheme of distribution of the last two wills was essentially the same, viz: income to his wife and children, the latter to be ultimate beneficiaries of the principal after the death of their mother or after they attained thirty years of age, whichever last occurred.

### Discussion

As stated on page 13 of the brief of defendant and argued by its counsel, the Commissioner of Internal Revenue found, after administrative review of the estate tax return, that the bonds purchased by the decedent in the names of his two minor daughters were includable in his gross estate as transfers made in contemplation of death [2] under the provisions of Sec. 811(c) of the Internal Revenue Code of 1939, as amended.[3]

As the findings of fact indicate, I am of the opinion that with respect to the bonds which are the subject of this action, the plaintiffs have met their burden of proof and have established by a preponderance of the evidence that these transfers were not made in contemplation of death, but that they were made principally because of motives associated with life. See Allen v. Trust Co. of Georgia, 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367; United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867.

From all the evidence in the case, I believe it can be reasonably and fairly inferred that decedent purchased all the bonds involved to provide for the welfare of his daughters; and, with particular reference to the bonds purchased in January, 1946, that he had a double purpose in mind, viz: to forestall his wife from inducing him to apply the proceeds of his bonds to her wants, which he thought were extravagant, and to insure the education as well as the welfare of his daughters. After January, 1946, all the bonds were placed in his safety deposit box to which his wife had access and where they were available for the use and benefit of his daughters during his lifetime if the occasion arose, as well as after his death.

Defendant placed emphasis on the fact that for some time decedent knew he was afflicted with an incurable disease and that this knowledge was the compelling motive for the transfer. But as plaintiffs pointed out, polycythemia rubra vera is not generally known to laymen as a fatal malady as is cancer. On the contrary, the evidence indicates the decedent was unaware of its character and effect but believed that his polycythemia was under control and that it was not fatal. The fact that he had this disease cannot of itself be regarded as decisive

---

2. See brief of defendant under "Argument", p. 6.

3. 26 U.S.C. § 811 (1952 ed.):
   "§ 811. Gross estate
   "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—
   * * * * *
   "(c) [as amended by Sec. 7(a), Act of October 25, 1949, c. 720, 63 Stat. 891] *Transfers in contemplation of, or taking effect at, death*

"(1) General rule. To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise—
   "(A) in contemplation of his death. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter;".

that the dominant motive behind the bond purchases was one associated with death.

Although the evidence is not so clear as to make the ultimate finding concerning decedent's subjective motives free from doubt, I think "the plaintiffs are entitled to every intendment in their favor" which may appear with reasonable certainty from the evidence. First Trust & Deposit Co. v. Shaughnessy, 2 Cir., 1943, 134 F.2d 940, 941; Belyea's Estate v. Commissioner of Internal Revenue, 3 Cir., 1953, 206 F.2d 262.

The presumption which applies to the bonds purchased for Rachel and Benita within two years of death has not been overlooked, but as suggested by the two cases last cited, it "adds nothing to the normal burden of proof which is imposed upon a taxpayer whenever he challenges an administrative assessment." Belyea's Estate, supra, at page 267.

In two respects I think plaintiffs failed in their proof. First, plaintiffs produced testimony that decedent did not have polycythemia vera at all but was afflicted with the non-fatal disease known as erythrocytosis. For the defendant, Doctors Donald W. Bortz and William M. Cooper testified that in their opinions decedent was afflicted with polycythemia vera. Plaintiffs objected to admitting in evidence these opinions on the grounds that they were based on the opinions of other doctors. They presented a separate brief on this question which has been considered. It appears clearly to me that the opinion of Dr. Bortz was based on the clinical records admitted in evidence. This doctor had also examined the decedent on October 23, 1946 at the Cleveland Clinic and reported in writing on his condition at that time.[4] From his extensive experience and knowledge of the subject matter involved as it related to decedent, he was eminently qualified

and his opinion is entitled to considerable weight. Likewise, the facts upon which Dr. Cooper based his opinion were from these records which had been carefully studied by him. We think the opinions of both doctors were admissible,[5] but even without them, and viewing the other evidence in its entirety, we would find decedent was afflicted with polycythemia vera. Among other indications, Dr. Haden, renowned expert, and one of decedent's treating physicians, so declared in the death certificate[6] and in the proofs of death sent to the Metropolitan Life Insurance Company.[7] The contradictory testimony of Dr. Goldstein, the family physician, that he suffered only from the non-fatal erythrocytosis was considerably weakened by his affidavit in which he agreed that decedent suffered from polycythemia vera.[8]

Second, relying solely on the strength of the testimony of Dora Foster, the bookkeeper, they contend that decedent overdrew $57,000 from the funds of the partnership, and that his partner-brother, Ike, agreed to cancel this indebtedness on October 31, 1945, on condition that decedent use the money to purchase United States savings bonds in the names of his two daughters, who were objects of their uncle's affection. Accordingly, on January 7, 1946, with the proceeds of his share of the partnership bonds, decedent paid $37,000 for United States savings bonds (face value, $50,000) which were issued in the joint names of his daughters. I do not make a specific finding in accordance with Miss Foster's testimony because of plaintiffs' failure to corroborate it. The partnership books and records were not produced nor was their non-production explained. Although John C. Miller, the confidant and long-time employee of the decedent, and Mr. Janovitz, the family lawyer, and Mrs. Browarsky knew of the dispute between the brother-partners and the accusations

4. Plaintiffs' Exhibit D.

5. Gyulai v. Prudential Ins. Co. of America, 1939, 135 Pa.Super. 73, 4 A.2d 824; for a similar situation, see Taylor v. Taylor, 8 Cir., 1954, 211 F.2d 794.

6. Defendant's Ex. 5.

7. Plaintiffs' Ex. G; Testimony, p. 302.

8. Testimony, p. 179.

of overdrawing, none of them knew of the alleged condition of the settlement. Of course, if the Foster testimony in that respect could be safely credited, I would have been satisfied beyond question of my findings in favor of plaintiffs.

Conclusions of Law

1. The bonds described in Findings of Fact Nos. 12 and 16 were not purchased with funds of the decedent and are not properly includable in the estate of the decedent for estate tax purposes.

2. The purchases of bonds by the decedent in the names of his children, Rachel Sandra Browarsky and Benita Browarsky, or in the name of either of them, did not constitute transfers of his property made in contemplation of death within the meaning of that phrase as it is used in § 811(c) of the Internal Revenue Act of 1939, as amended.

3. The bonds purchased by the decedent in the names of his children, Rachel Sandra Browarsky and Benita Browarsky, or in the name of either of them, are not includable in the estate of the decedent for estate tax purposes.

4. The plaintiffs are entitled to a refund of all estate taxes and interest paid by plaintiffs because of the inclusion of the bonds purchased by Ike Browarsky or by the decedent in the names of Rachel Sandra Browarsky and Benita Browarsky, or in the name of either of them, as property of the decedent for estate tax purposes with interest at six per cent from the date of payment.

5. The plaintiffs are entitled to an additional refund, by virtue of an additional allowance of administration expenses incurred in administering the decedent's estate, for counsel fees and expenses in prosecuting the claim for refund and this suit.

6. The defendant is entitled to a set-off for unpaid gift taxes.

7. Judgment shall be entered for the plaintiffs in such an amount as shall be ascertained from a recomputation of the decedent's estate tax in accordance with the foregoing findings of fact and conclusions of law, with interest.