Lederer, Appellant, *v.* Metropolitan Life Insurance Company.

Argued October 4, 1938.

62

Be-
fore Keller, P. J., Cunningham, Baldrige, Stadtfeld,
Parker and Rhodes, JJ. 

*Jacob Weinstein,* with him *Michael Serody,* for appellant.

*Owen B. Rhoads,* with him *John Bishop, Dechert, Smith & Clark* and *Harry Cole Bates,* for appellee.

Opinion by Cunningham, J., March 3, 1939:

In its broad outlines, the question of law involved upon this appeal is whether the plaintiff below, appellant herein, would have been entitled to go to the jury even if a certified copy of a death certificate, issued under Section 21 of the Act of June 7, 1915, P. L. 900, as amended May 24, 1933, 35 PS §471, had been admitted in evidence at her instance.

The action below was upon a policy of insurance issued August 26, 1929, by the defendant company, in the sum of $500, upon the life of Judith Segal and naming her sister, Emma Lederer, the plaintiff, as the beneficiary. Upon proof of the death of the insured on March 25, 1934, the company paid the beneficiary the face of the policy. One of the features of the insurance contract was an "Accidental Death Benefit, payable in the event of death from accident as [therein] limited and provided," in the additional sum of $500.

It was out of this supplementary contract that the present controversy and action arose. By reason of the marriage of the plaintiff subsequent to the institution of her suit, the caption was amended as indicated.

By the provisions of the supplementary contract, now material, the company agreed to pay the beneficiary of record $500, upon receipt of "due proof of the death of the insured, as the result, directly and independently of all other causes, of bodily injuries sustained through external violent and accidental means, provided ...... that death shall ...... not have been caused by or contributed to, directly or indirectly, or wholly, or partially, by disease, or by bodily or mental infirmity."

Plaintiff in her statement of claim averred, in substance, that the insured's death was a "death from accident," within the meaning of the contract. The defense interposed by the company in its affidavit was "that the insured was suffering from high blood pressure and fainting spells and her death was caused or contributed to by disease or by bodily or mental infirmity."

At the trial before KNOWLES, J., the only oral testimony presented by plaintiff was her own; the defendant company offered no evidence but submitted a point for binding instructions; the trial judge directed a verdict for defendant and the court, in banc, denied plaintiff's motion for a new trial; this appeal by her from the judgment entered upon the verdict followed.

The extent of the burden of proof imposed upon appellant, under her averments and the answer of the appellee insurance company, has been definitely indicated in prior decisions. In construing a substantially similar provision in *Lubowicki v. Metro. Life Ins. Co.,* 114 Pa. Superior Ct. 596, 599, 174 A. 649, we said: "Under firmly established principles of law applicable to the issues framed by the pleadings, appellant had the burden of proving, by competent evidence, (a) that the insured's death was caused by external, violent

and accidental, means, and (b) that it resulted solely from such means, i. e. was not 'caused, or contributed to, directly or indirectly or wholly or partially, by disease, or by bodily or mental infirmity.' " To the same effect see *Cockcroft v. Metro. Life Ins. Co.*, 125 Pa. Superior Ct. 293, 297, 189 A. 687.

The material portions of the evidence by which appellant endeavored to sustain her suit will be quoted as delivered by her.

Appellant and the insured lived together at 809 South 59th Street, Philadelphia. On Sunday, March 25, 1934, about four o'clock in the afternoon, she left her sister alone in their home and went to visit relatives and friends elsewhere in the city and vicinity, promising to return at eight o'clock for dinner. Her description of the tragedy reads: "Q. When you got home, what happened, if anything? A. Well, I opened the door—Q. On what floor did you live—on the ground floor? A. Yes, we lived in a house, it was an enclosed porch, and I went in and I opened the living room door, I walked in, and as I got into the room, it seemed to me I smelt the odor of gas, and I walked into the dining room, and it was very bad, and when I got into the kitchen, it was very strong, and I looked around, and I rushed toward the gas range, and my sister was on the floor, and I saw the burner open on the gas range and everything had boiled over in the pot. ...... Q. What did you see open on the gas range? A. Why one jet, there was one jet open. Q. You say there was a pot there? A. Yes, there was a pot there on the stove. Q. With relation to the pot and the stove, were they close together? I do not want to lead you. A. The pot was on the burner, but there was no fire— Q. There was no flame? A. There was no flame, and I shut the jet off and hurriedly opened the windows and picked my sister up and pulled her over to the window and shook her, trying to revive her, and when I saw that I couldn't I called for help, and ...... they rushed my

sister to the Misericordia Hospital, and I went along, and they tried to revive her, but they couldn't. That was all. ...... Q. Now we will go back to the stove. You said something about the pot and the stove. Tell us what you saw when you looked after you had the patient off your hands. A. There was a piece of meat in the pot, and there was very little of the fluid left. Q. Where? A. In the pot, and outside of the pot was all greasy, run over, and the catch pan under the gas range, it was full of the grease that had run over. That's all."

The evidence relative to a "bodily infirmity" with which the insured had been afflicted for a number of months was thus developed upon appellant's cross-examination: "Q. Actually your sister had been ill for some time, hadn't she? A. Not in bed. She had had high blood pressure for a long time. Q. And she had suffered from fainting spells? A. Well, she had—she had a fainting spell in September, the latter part of September. That was the first fainting spell she had ever had to my knowledge. Then the day before Thanksgiving Day, the afternoon before Thanksgiving Day, she felt very faint again—it didn't last very long, but she just seemed to be overcome. So Thanksgiving Day, in the morning, she woke and she didn't feel very well, and I took her down to our physician, Dr. Michael Sussman, at 6th and Pine. Q. And she had been treated by Dr. Sussman for some period of time for this high blood pressure and fainting spells? A. Well, off and on —no, she was never treated for fainting spells, because she had only had that one before, and then she had this one on the afternoon before Thanksgiving Day, and I took her down to Dr. Sussman, and he took her blood pressure and he told her to go home. He gave her some pills and told her to go home and go to bed, which she did. In the afternoon she got up and she cooked and felt fine again that very day. Then she had a fainting spell the latter part of February. Now, those were the

only three instances where she had these fainting spells. They were of very short duration. It so happened that I was with her at each time."

Appellant admitted that in an affidavit given by her to the coroner the day following the death of the insured she stated, inter alia, her sister "had high blood pressure for the last two years," and "was subject to fainting and weak spells for the last six months."

We agree with the trial judge upon the proposition that appellant's oral testimony was not sufficient to take the case to the jury. Even, when she is given the benefit of every possible inference, it would not sustain a finding that the insured's death was caused *solely* by *external,* violent and accidental, means. It presented a picture of a woman, alone in her home and subject to fainting spells, preparing dinner for her absent sister and herself over a gas range. She is found, by the first person entering the house, lying unconscious beside the range; the pot in which she was cooking meat has boiled over; the gas flame, which must have been burning for a period of time sufficient to cause the fluids in the pot to boil, has been extinguished and gas is escaping from the open jet. To permit a jury to conclude from this evidence that the insured's death a few hours later was caused *directly* and *solely* by the escaping gas, and was not contributed to in any way by her bodily infirmity would be to permit its members to indulge in pure speculation. It is equally, if not more, probable, under appellant's own testimony, that her sister fell to the floor by reason of a fainting spell, attributable to her high blood pressure, and that while she was in an unconscious condition the pot boiled over with the result that the overflowing fluids extinguished the gas flame.

Even if appellant be given the benefit of an inference that gas poisoning was the *immediate* cause of the insured's death, her testimony not only failed to exclude "all other causes," but, indeed, contained affirmative

proof that her sister had a "bodily infirmity" which would account for the decedent's failure to close the gas jet after the flame had been extinguished. There is no intimation of suicide anywhere in this record, but the failure, or inability, of the insured to shut off the gas after the flame had been extinguished was clearly a contributory factor in causing her death.

None of the physicians or attendants at the hospital, where unsuccessful efforts were made to revive the insured, were called, but counsel for appellant, in an effort to show gas poisoning as the cause of her death offered in evidence a copy of the death certificate of the insured filed, under the provisions of the seventh section of the Act of June 7, 1915, P. L. 900, as amended by the Act of May 24, 1933, P. L. 976, 35 PS §457, and duly certified under date of February 19, 1937. The offer was specifically made " to show the *cause* of death," (R. 23a), and was objected to by counsel for the company upon the ground that "the act only provides that it may be offered as to the facts that the certificate contains. More than that, it contains opinions and conclusions," (R. 12a). The sustaining of this objection and the exclusion of the certificate raised the question of law with which we are now concerned.

The certificate in this case was signed by C. H. Hersch, M. D., the coroner of Philadelphia County, under the authority vested in him by Section 8 of the statute.

Section 7 deals specifically with the certificate of death and provides it shall contain, inter alia, the name of decedent, date of birth, age and date of death.

Where the deceased was attended by a physician at death, the section requires, Par. 2 (17), that the certificate set forth, "Cause of death, including primary and immediate causes, and contributory causes or complications, if any, and duration of each." It is also required that the attending physician, if any, shall "state the cause of death so as to show the course of disease,

or sequence of causes resulting in death, giving the primary and immediate causes, and also the contributory causes, if any, and the duration of each."

A further provision of the section is that, "Causes of death which may be the result of either disease or violence shall be carefully defined; and, if from violence, its nature shall be stated, and whether (probably) accidental, suicidal, or homicidal."

One difficulty with this case is that the original certificate was not made by an attending physician. Under the circumstances here present and the provisions of Section 8, it became the duty of the coroner of Philadelphia County to hold an inquest on the body of the insured and make the certificate of death.

The applicable provision of the section reads: "And any coroner whose duty it is to ...... make the certificate of death ...... shall state in his certificate the nature of the disease or the manner of death; and if from external causes, or violence, whether (probably) accidental, suicidal, or homicidal, as determined by the inquest. ......"

By Section 21, cited at the beginning of this opinion, it is expressly provided that a duly certified copy of a death certificate "shall be prima facie evidence in all courts and places of the facts therein stated."

An examination of the copy here offered discloses that in the portion signed by the registrar, as authorized by Section 8, it is stated, inter alia, that insured was a widow thirty-one years of age, and that she died on March 25, 1934. The other section, entitled "Medical Certificate of Death," was signed by the coroner. That portion reads:

"MEDICAL CERTIFICATE OF DEATH
21. DATE OF DEATH (month, day, and year)
3-25 1934

\* \* \* \* \*

22. I HEREBY CERTIFY, That the principal cause of death and related causes of importance

were as follows: Asphyxia Carbon Monoxide poisoning due to gas coming from a gas Range at home. Other contributory causes of importance: Accidental."

It is to be noted that the certificate was not filled out in accordance with the provisions of the statute, requiring that the primary and immediate cause of death be stated, and also the contributory causes, if any. Insofar as the "cause," as distinguished from the "manner," of death is concerned the only thing set out in the certificate is that the "principal" cause was poisoning by gas coming from a range. Instead of answering the question relative to "other contributory causes of importance" by stating them, or saying there were none, the coroner wrote in the blank space following that question the word "Accidental," as his conclusion that the death was, in the language of the statute, *probably* accidental.

This legislation makes a clear distinction between statements relative to the *cause,* and those concerning the *manner,* of a death; as to the former the statement is required to be "definite," but only "probable" as to the latter. The reason for the distinction is obvious. The cause of a death is usually established by the opinion testimony of medical experts, whereas a conclusion upon the question whether a death from "external causes or violence" was "accidental, suicidal, or homicidal," may ordinarily be determined by a jury without the assistance of expert witnesses. See *Troxell v. Shirk et al.,* 130 Pa. Superior Ct. 40, 196 A. 899. But as the certificate was not offered for the purpose of showing the "manner" of death, we need not pursue the subject.

Manifestly, the statements relative to the cause and manner of death made by the coroner in his certificate were not based upon his own knowledge of the circumstances; each was necessarily founded upon information received from others.

The question whether the legislation under discussion was intended to change the common law rule against the introduction of hearsay evidence in controversies growing out of contracts, and, if so, whether the omission from the title [1] of any reference to such purpose renders the feature of the legislation with which we are now concerned unconstitutional, has been referred to, but not decided, in a number of our cases. In *Borgon v. John Hancock M. Life Ins. Co.*, 99 Pa. Superior Ct. 377, KELLER, J., (now President Judge) referred to the differences of opinion prevailing in various jurisdictions relative to the admissibility of death certificates as evidence of the cause, as distinguished from the fact, of death. In the opinion in that case will be found citations of a number of authorities upon each side of the question. Other cases in which one phase or another of the subject was referred to are: *Wilmer v. Industrial Health, Accident and Life Ins. Co. et al.*, 101 Pa. Superior Ct. 366; *Allegheny Trust Co. v. State Life Ins. Co.*, 110 Pa. Superior Ct. 37, 167 A. 251; *Trotter v. Industrial Health, Accident and Life Ins. Co.*, 115 Pa. Superior Ct. 487, 175 A. 884; *Jones v. Industrial Health, Accident and Life Ins. Co.*, 125 Pa. Superior Ct. 143, 189 A. 734; *Oliver v. Industrial Health, Accident and Life Ins. Co.*, 125 Pa. Superior Ct. 149, 189 A. 736;

[1] "To provide for the immediate registration of all births and deaths throughout the Commonwealth of Pennsylvania, by means of certificates of births and deaths, and burial or removal permits; requiring prompt returns to the Central Bureau of Vital Statistics, as required to be established by the State Department of Health; and, in order to secure prompt and faithful registration of births, marriages, deaths, and diseases, of practitioners of medicine and surgery, of midwives, nurses, and undertakers, and of all persons whose occupation is deemed to be of importance in obtaining complete registration of births, deaths, marriages, and diseases throughout the State, as provided in section ten of an act, entitled 'An act creating the Department of Health and defining its powers and duties,' approved the twenty-seventh day of April, nineteen hundred and five, and providing penalties for violations of this act."

*Cockcroft v. Metropolitan Life Ins. Co.,* supra; *Griffin v. National Mining Co.,* 127 Pa. Superior Ct. 588, 193 A. 447; *Johnson v. Valvoline Oil Co. et al.,* 131 Pa. Superior Ct. 266, 271, 200 A. 224; *Jensen v. Continental Life Ins. Co.,* 28 Fed. 2d 545, (C. C. A. 3d—1928, certiorari denied 279 U. S. 842, 73 L. ed. 988, 49 S. Ct. 263); *Hardy v. State Mutual Benefit Society,* 111 Pa. Superior Ct. 336, 170 A. 704; *Monaghan v. Seeds & Durham et al.,* 134 Pa. Superior Ct. 469, 3 A. (2d) 998.

Each of these cases falls into one of two classifications, either, (1) no objection was raised to the admission of the certificate and the question of its admissibility as an independent piece of evidence to show the cause of death was not passed upon, or, (2) it was offered by the defendant (usually because included in the plaintiff's proofs of death) as a declaration by the plaintiff against interest.

In other jurisdictions there is a definite contrariety of opinion upon the question of the admissibility (in actions between private parties and as independent and substantive evidence of causation) of certificates of death, made and certified under statutes providing that such certificate "shall be prima facie evidence of the facts therein stated."

In addition to the cases cited in the Borgon case as holding such certificates admissible, reference may be made to *Abbott v. Prudential Ins. Co. of America,* 89 N. H. 149, 195 A. 413, a suit on a life insurance policy to recover double indemnity for death resulting "solely through external, violent and accidental, means" and in which the insured was shown to have died from a cerebral hemorrhage a week after an automobile accident. Without the certificate the plaintiff could not make out her case, but with it in evidence she could. It was held the certificate should have been admitted under the general exception to the hearsay rule authorizing the admission of official records made by a public

officer in the course of his public duties as prima facie evidence of the facts required by statute to be recorded.

To the contrary is *Beglin v. Metropolitan Life Ins. Co.,* 173 N. Y. 374, 66 N. E. 102, cited in the Borgon case. There the Court of Appeals of New York said of a statute similar to ours: "This statute was a police regulation, required for public purposes, and became prima facie evidence so far as concerns questions arising under its provisions which involve public rights. But we think it was not the intention of the legislature to change the common law rule of evidence in controversies of private parties growing out of contract, and that the provisions of the statute should not be construed as applicable to such cases."

An appropriate method of settling the question was adopted by the legislature of Vermont by amending its Vital Statistics Act so as to provide that no certificate should be competent to prove anything "except the fact of birth, marriage, or death": *McKinstry v. Collins,* 76 Vt. 221, 56 A. 985.

The danger of departing from established common law rules and admitting as evidence inferences and conclusions of certificate makers, frequently based solely upon information obtained (sometimes at second hand) from relatives or friends of a decedent, is, we think, quite apparent.

However, under the view we take of the case now at bar, it is not necessary for us to pass upon the admissibility in general of certified copies of death certificates offered as substantive evidence of the cause of death, nor of the admissibility of the particular certificate excluded by the trial judge. The situation here differs, in our opinion, from that existing in *Abbott v. Prudential Ins. Co.* supra. There the admission of the certificate made out a prima facie case for the plaintiff and entitled her to go to the jury. We stated above our reasons for holding that the oral testimony of the present appellant was not sufficient to carry successfully

her burden of proof. In our opinion, the admission of the certificate offered in her behalf would not have supplied the deficiencies in her proofs. At the most, it would have been prima facie evidence that the *principal* cause of the insured's death was gas poisoning. That conclusion follows with equal, if not greater, force from appellant's oral testimony. Admission of the certificate would have added nothing to it. The difficulty with appellant's case is that evidence of the highest quality and proving definitely that the *immediate* cause of her sister's death was the inhalation of gas flowing from the open jet would not, when considered with the rest of her testimony, take the case to the jury. There was nothing in the certificate which would have shown the death was *solely* due to gas poisoning and had not been contributed to in any degree by the insured's physical infirmity, nor was there anything in it which would have negatived or neutralized the circumstantial evidence that the admitted physical infirmity contributed to the fatal result. Its exclusion, therefore, did appellant no harm. Neither of the assignments of error can be sustained.

Judgment affirmed.