Margaret L. POLLARD, Appellant,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Appellee.

No. 78–1934.

United States Court of Appeals, Third Circuit.

Submitted Jan. 16, 1979.

Decided May 8, 1979.

Samuel J. Goldstein, Pittsburgh, Pa., for appellant.

Alexander Black, Bruce I. Booken, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellee.

Before ADAMS and WEIS, Circuit Judges, and WEINER, District Judge.*

## OPINION OF THE COURT

WEINER, District Judge.

The appellant in this diversity case seeks to overturn a jury verdict rendered in favor of the defendant, the Metropolitan Life Insurance Company. The jury found that the appellant was not entitled to recover accidental death insurance benefits under two policies covering her deceased husband. The trial judge entered judgment for the defendant, and denied the appellant's motion for a new trial. Upon review of the evidentiary rulings and jury instructions which have been attacked by the appellant, we conclude that no error was committed by the court below. Accordingly we affirm the judgment and the denial of appellant's motion for a new trial.

The record shows that on October 7, 1974, the appellant's husband, Walter Pollard, a resident of Greensburg, Pennsylvania, was in Hampton, South Carolina for a business conference. He and his co-workers were assigned separate bedrooms at the Micarta Lodge, which was owned by their employer, the Westinghouse Electric Corporation. That evening, Mr. Pollard and several other employees dined at a restaurant that served alcoholic beverages. After dinner, Pollard and his co-workers returned to the Lodge where, after a short time, Pollard's speech became slurred and he stumbled when attempting to rise from his seat. Believing that Pollard was drunk, two co-workers escorted Pollard to his room and placed him on his bed fully clothed. The next morning, Pollard was found dead in his room.

A necropsy report indicated that Pollard died as a result of asphyxia due to aspiration of his gastric contents caused by acute alcohol and drug intoxication.[1] The report also showed enlargement and fatty degeneration of his liver, and mild to moderate atherosclerosis.

The decedent was insured by the defendant, the Metropolitan Life Insurance Co., under two group insurance policies providing for benefits upon accidental death. Under the terms of the policies, in order to recover, death must have occurred to the insured, "solely by violent, external and accidental means". Both policies contain a clause which bars payment of death benefits when death is caused by or results from "intentional self-destruction or intentionally self-inflicted injury while sane or insane". Citing the ingestion of alcohol and tranquilizers by the decedent, and the enlargement and fatty degeneration of the decedent's liver, the defendant refused to pay Pollard's widow the death benefits provided by the policies.

At trial, the appellant sought to introduce into evidence the death certificate, coroner's certificate (cause of death memorandum) and pathologist's (necropsy) report. Her first ground for reversal is that the trial judge erred when he ruled that the documents would be admitted into evidence only if statements contained within them, which declared that the death was accidental,

---

* Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. A toxicological examination revealed that Pollard had a blood ethanol level of 322 mgm./dl. A urine drug screen revealed Pentobarbital, Phenothiazine and Propoxyphene. The blood levels were: Pentobarbital 2.1 mgm./100 cc., Propoxyphene 0.4 mgm./100 cc., Phenothiazine 1.6 mgm./100 cc.

were excised.[2] It was ostensibly because of this limitation that the appellant ultimately decided not to present the documents to the jury. (Tr. 430).

We must first determine which body of law is looked to when deciding whether the limitation imposed on the admissibility of the documents was erroneous. The appellant asserts that since Pennsylvania law governs the rights of the parties under the insurance contract, Pennsylvania evidentiary law is controlling with regard to the admissibility of the death certificate. She also contends that along with the Federal Rules of Evidence, Pennsylvania law is looked to with regard to the admissibility of the coroner's certificate and pathologist's report. The appellee maintains that the Federal Rules of Evidence control these evidentiary issues.

We hold that the Federal Rules of Evidence govern the admissibility of documentary evidence in Federal diversity cases.[3] *Kingsley v. Baker/Beech-Nut Corp.*, 546 F.2d 1136, 1140 (5th Cir. 1977); *Conway v. Chemical Leaman Tank Lines, Inc.*, 525 F.2d 927, 930 (5th Cir. 1976). *See United Telecommunications v. American Tel. & Communications Corp.*, 536 F.2d 1310, 1316 (10th Cir. 1976). The rules were enacted by Congress to "govern proceedings in the courts of the United States". Rule 101. While the rules do show a desire by Congress to defer to state law in diversity cases on such matters as presumptions (Rule 302), privileges (Rule 501) and competency (Rule 601), there is no similar deference concerning the admissibility of documentary evidence.

The law is well settled that we are to review a trial judge's discretionary determination using the "manifestly erroneous" standard. *Atlantic Mutual Insurance Co. v. Lavino Shipping Co.*, 441 F.2d 473 (3d Cir. 1971); *United States v. Lopez*, 543 F.2d 1156, 1158 (5th Cir. 1976) *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1150, 51 L.Ed.2d 566 (1977). An examination of the record indicates that the limitation imposed on the admission of the documents did not violate the Federal Rules of Evidence. Under Rule 403, a trial judge can exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . .".

The following factors support our conclusion that the trial judge's ruling was not "manifestly erroneous". The death certificate and coroner's certificate report describe the cause of death as asphyxia due to aspiration of gastric contents due to acute ethanol intoxication, and conclude that death was accidental. However, the probative value of these documents undoubtedly was slight, because they were prepared prior to October 16, 1974, when the toxicologist's report was completed.[4] Moreover, Dr. Brissie, the consulting pathologist who assisted in the preparation of the necropsy report, testified that he did not serve as a medical examiner for the coroner. He also testified that in view of the information added by the toxicologist's report, he certainly would amend the cause of death form. (Tr. 207–209)

To be balanced against the probative value is the evidence's prejudicial effect. Dr. Brissie testified that he was neither requested to investigate this death, nor informed of the precise language of the acci-

2. Although the appellant states in her brief that the court "refused to permit the foregoing materials to be submitted to the jury", the transcript shows that the judge would have admitted the materials subject to the limitation. (Tr. 429)

3. The Federal Rules of Evidence apply to actions brought "subsequent to the one hundred and eightieth day after January 2, 1975" (July 1, 1975). Pub.L. 93–595. Although this case was instituted on June 30, 1975, the statute adopting the Rules also states that they are to

apply to "further procedure in actions, cases and proceedings then pending except to the extent that application of the rules would not be feasible or would work injustice". Since this case was tried on June 13, 14, and 15, 1977, almost two years after the Rules of Evidence went into effect, these rules are properly applied in determining the propriety of the district court's evidentiary rulings.

4. The toxicologist's report revealed an overdose of multiple depressant drugs and ethanol.

dental death provision of the policy. (Tr. 209–210). It is apparent that if the documents had been freely admitted into evidence, without limitation on content, the jury would have been misled into believing that the documents were based on a comprehensive investigation grounded on complete information and that Dr. Brissie's conclusion as to the manner of death took into consideration the language used in the policy.

In addition, it must be noted that the coroner is required to make a determination regarding the cause of death. Though he is to determine whether the death was a homicide, a suicide or an accident, and is to conclude whether it was natural or undetermined, his decision is not binding for purposes of suit, for it is used merely for statistical purposes and to guide the district attorney's office and/or any parties. (Tr. 207–209)

Another factor which the court undoubtedly believed would prejudice the jury was the fact that the term "accidental death", as defined in the policy, may well have had a different meaning than that term as used by Dr. Brissie in his report.

Lastly we note that the trial judge's ruling did not keep objective factors from the jury. He states:

"The exhibits that refer to [the] accident need not be given to the jury. If they make a request, we will give it to them in an appropriate form." (Tr. 429–430)

Appellee's counsel then suggested that the word accident could be blanked off. We find the judge's ruling to be a precautionary measure taken to safeguard the jury from prejudice. After defining the word "accidental" in both its everyday usage and as used in the policy, he properly left to the jury the determination whether the evidence and objective factors proved "accidental death". We therefore conclude that

his rulings on this point were not "manifestly erroneous".[5]

The appellant further argues that several portions of the court's charge to the jury were not in accordance with Pennsylvania law, which both parties agree controls the substantive issues at bar. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Daburlos v. Commercial Ins. Co. of Newark, N. J.*, 521 F.2d 18, 19 (3rd Cir. 1975). One alleged error involves the "presumption against suicide". The court instructed the jury that in determining whether Mr. Pollard's death was accidental or intentional, the jury is, "permitted to consider the fact that there is in human nature, an instinct for self-preservation. But these circumstances does (sic) not in and of itself establish the fact that Mr. Pollard died through accidental means".

The appellant appears to assert that the jury should have been instructed that in the absence of facts establishing otherwise, it should presume accidental death. Ironically, this contention ignores the very case on which the appellant primarily relies. In *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 173 A. 644 (1934) the Pennsylvania Supreme Court stated that the "so-called presumption against suicide," is "merely a permissible consideration of the non-probability of death by suicide," and properly speaking is not a presumption at all. It is a well established rule that on the issue of accidental death, it is the plaintiff who has the ultimate burden of establishing that death resulted from an accident rather than from suicide. *Id.*, 315 Pa. 497, 505, 506, 173 A. 644, 648–649; *Waldron v. Metropolitan Life Ins. Co.*, 347 Pa. 257, 31 A.2d 902 (1943); *Heffron v. Prudential Ins. Co. of America*, 144 Pa.Super. 307, 19 A.2d 556 (1941). The judge's instruction regarding the presumption against suicide is therefore a correct statement of Pennsylva-

---

**5.** The appellant also points to Rule 803(9) which provided an exception to the hearsay rule for records of vital statistics and to Rule 901(b)(7) which pertains to the authentication of public records as an additional basis for the total admissibility of the documents involved in this case. However, these rules do not mandate the admission of evidence, but only provide a means for allowing into evidence documents which are otherwise admissible. *See* Advisory Committee's Notes to Rule 803 and Rule 901(b).

nia law. Although the appellant cites *Mac-Donald v. Penn. R.R.*, 348 Pa. 558, 36 A.2d 492 (1944), neither it nor other Pennsylvania decisions lead to a contrary view.

█ The appellant advances several other contentions, each of which is easily disposed of. She asserts that the court below did not properly charge the jury on the weight to be accorded to the expert testimony presented at trial, because it failed to state that opinion evidence is the "weakest form of evidence". The court instructed the jury that it "should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves. You may accept the opinion or reject it entirely". While an instruction such as that advocated by the appellant might be called for when the opinion of an expert was in clear contradiction to "positive evidence of actual facts", *Kuchinic v. McCrory*, 439 Pa. 314, 319, 266 A.2d 723, 725–726 (1970); *Ray v. Philadelphia*, 344 Pa. 439, 441–42, 25 A.2d 145, 146 (1942), the testimony of the medical experts in this case regarding the cause of death was consistent with factual evidence presented at the trial. Accordingly, the judge's instruction was correct. *See Marrazzo v. Scranton Nehi Bottling Co.*, 422 Pa. 518, 223 A.2d 17 (1966); *Masciantonio Will*, 392 Pa. 362, 383–384, 141 A.2d 362, 372–373 (1958).

█ As another ground for reversal, the appellant contends that the trial judge incorrectly charged the jury on the meaning of "accidental" death. The judge stated that the term "accidental" means "undesigned, unexpected and unpremeditated". He told the jury that if it found that "the substances that caused asphyxiation *were intentionally taken by Mr. Pollard for the purpose of self-destruction or for the purpose of inflicting serious bodily injury on himself*", (emphasis supplied) then it should not find that the insured's death was accidental.[6]

The appellant cites *Beckham v. Travelers Ins. Co.*, 424 Pa. 107, 225 A.2d 532 (1967) in support of her assertion that the above instruction is in conflict with the governing Pennsylvania law on the subject of accidental death. In *Beckham*, the Pennsylvania Supreme Court abolished the rule that denied recovery of insurance benefits for accidental death, "if the insured's death, although unintentional, resulted from an intentional act of the deceased". *Id.*, at 110, 225 A.2d at 533. In abandoning its former rule, the court allowed recovery under an insurance policy covering death "through accidental means", in a case where the occurrence of death was accidental, and the acts leading to death, although intentionally committed, were not engaged in by the insured for the purpose of committing suicide. However, the court countenanced the inclusion of contractual limitations in insurance policies which would disclaim coverage when the insured intentionally exposed himself to danger. *Id.* at 117, 225 A.2d at 537.

In light of the above, the court's instruction must be regarded as proper. The court did not state that the jury should find that death was not accidental if it merely found that the decedent intentionally, although without suicidal intent, ingested the substances causing asphyxiation. Instead, the court charged that in determining whether the plaintiff had met her burden of showing that death was accidental, the jury should decide whether the substances were intentionally ingested "for the purpose of self-destruction". Moreover, in instructing the jury that it could make a finding that death was not accidental if it determined that the substances were intentionally taken by the deceased for the purpose of "inflicting serious bodily injury on himself", the court was merely restating a clause in the insurance policies which barred recovery for such deaths.

---

**6.** Although the policies restricted benefits to death which occurred solely through "violent, external and accidental" means, the Judge instructed the jury that death caused by the ingestion or consumption of drugs or a combination of drugs and alcohol is caused by violent and external means. Therefore, the key issue for jury determination was whether death was accidental.

Having found that the appellant's arguments are without merit,[7] the judgment of the district court is affirmed.

ADAMS, Circuit Judge, dissenting.

On the morning of October 7, 1974, Walter Pollard of Greensburg, Pennsylvania, was found dead in his hotel room in South Carolina, where he and a number of co-workers had been attending a business conference organized by their employer, Westinghouse Electric Corporation. The previous evening, Pollard and other employees had dined together at a restaurant, where he had consumed several alcoholic drinks. When later that evening Pollard's speech became slurred and he was unable to navigate easily, two co-workers escorted him to his room, leaving him fully clothed on his bed. Post-mortem tests revealed that Pollard's blood contained large quantities of alcohol and tranquilizers, and that he had died from asphyxiation resulting from aspiration of his gastric contents caused by alcohol and drug intoxication.

The majority has, in my view, properly disposed of most of the issues raised on this appeal by Margaret Pollard, who was unable to persuade a jury that she was entitled to recover on two life insurance policies insuring her deceased husband against accidental death. I believe, however, that the district court committed two errors that may not be overlooked under the harmless error rule,[1] and that a remand for a new trial is therefore warranted. First, the trial judge failed to instruct the jury properly on the meaning of "accidental" death. Second, the judge excluded statements contained in applicable death reports and documents that attributed Walter Pollard's death to accidental causes, without complying with the mandate of Federal Rule of Evidence 403.

A.

Because the insurance company's obligations in this diversity case are governed by Pennsylvania law, an appropriate analysis of the jury charge on the meaning of "accidental" death must begin with an examination of controlling state court precedent. At one time, an insurance company was not required under Pennsylvania law to pay the beneficiary of a conventional accidental death policy if the decedent died as the result of an intentional act performed by him, even though that act was not performed with the purpose of committing suicide. Pennsylvania adhered to the "accidental means—accidental result" test, whereby a death was deemed "accidental" only if *both* the means and the result were truly accidental; it did not permit recovery if an unintended death resulted from an intentional act. But this distinction was widely perceived as an untenable one that created inconsistent and frequently unjust results.[2]

To remedy this state of affairs, the Pennsylvania Supreme Court joined the modern trend, which was spearheaded by Justice Cardozo in his dissent in *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934),[3] and thus

---

7. We do not reach the merits of the appellant's contention that the trial judge's charge to the jury on the meaning of preponderance of the evidence was erroneous. Appellant did not object to this instruction before the jury retired, and is therefore precluded under Rule 51 of the Federal Rules of Civil Procedure from assigning this as an error. *Halij v. Fogarty*, 449 F.2d 1295 (3d Cir. 1971); *Jennings v. Boenning & Company*, 388 F.Supp. 1294, 1303–1304 (E.D. Pa.1975) *aff.* 523 F.2d 889 (3d Cir. 1975). *See Paluch v. Erie Lackawanna Railroad Co.*, 387 F.2d 996, 999–1000 (3d Cir. 1968).

1. 28 U.S.C. § 2111: "*Harmless error.* On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

2. *See Beckham v. Travelers Insurance Co.*, 424 Pa. 107, 111–15, 225 A.2d 532, 534–35 (1967).

3. Justice Cardozo had this to say about the accidental means-accidental result dichotomy:

The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian bog. "Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident." . . . On the other hand, the average man

abandoned what it termed the "artificial distinction between accidental means and accidental results."[4] Justice Roberts, speaking for the Court in *Beckham v. Travelers Ins. Co.,* 424 Pa. 107, 225 A.2d 532 (1967), explained this clear departure from earlier precedent:

> Continued adherence to this distinction would not only fail to serve a useful purpose but would condone ambiguity in a context in which we have traditionally insisted upon clarity and precision.[5]

A prime concern to the Pennsylvania Supreme Court, in *Beckham* as well as in later cases, has been that the reasonable expectation of an insured not be frustrated by the use of technical and ambiguous language in an insurance contract that would be susceptible to different interpretations.[6] Accordingly, if an insurance company desires to disclaim liability when death results from an act intentionally performed by the deceased though without an intent to commit suicide, it may do so, but only through an explicit limitation upon coverage.[7] Absent an express provision to that effect, the *Beckham* court declared, policies covering accidental death would be construed by Pennsylvania courts so as to conform to the public's expectations:

"When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means.[8] "

Arguably, the present case is illustrative of the type of situation that the *Beckham* rule was designed to cover. Where an insured such as Walter Pollard dies because he had ingested—presumably intentionally—alcohol, drugs or any other potentially lethal substance, and there is no evidence that he did so with the intention of committing suicide, the insurance company may not, under *Beckham,* avoid its contractual obligation by arguing that death did not result from "accidental means" because the toxic substance was intentionally consumed. Indeed, *Beckham* itself involved an insured who had died as a result of a self-administered overdose of narcotics, and yet recovery was permitted.

In addition, the Metropolitan Life policies under which Walter Pollard was insured contained typical personal accident insurance plans, similar in their operative language to that of the policy in question in the *Beckham* case: they guaranteed payment in the event of death or bodily injury sustained solely through "accidental means."[9] The term "accidental means" was not explicitly defined in the Metropoli-

---

> is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company. . . . The proposed distinction will not survive the application of that test. 291 U.S. at 499, 54 S.Ct. at 463–464.

4.   *Beckham, supra,* 424 Pa. at 115, 225 A.2d at 535.

5.   *Id.*

6.   *See, e. g., id.; Collister v. Nationwide Life Ins. Co.,* 479 Pa. 579, 593, 388 A.2d 1346, 1353 (1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

7.   "While we see nothing improper in a contractual limitation which would disclaim coverage in cases such as the instant one, we are unwilling to recognize such a restriction on the basis of the ambiguous language contained in this policy which the [insurance] company knew was susceptible of different interpretations."

*Beckham, supra,* 424 Pa. at 117, 225 A.2d at 537 (footnote omitted).

8.   *Id., quoting Landress, supra,* 291 U.S at 499, 54 S.Ct. 461.

9.   The Metropolitan Life policies issued to Mr. Pollard provide for the payment of benefits in the event that the insured suffers bodily injury or death "solely through violent external and accidental means. . . ." The judge instructed the jury that "death caused by the ingestion or consumption of drugs or a combination of drugs and alcohol is caused by violent and external means," app. at 14a, and this charge was not challenged by the insurance company. *Beckham* involved a provision awarding double indemnity in the event that " 'bodily injury not hereinafter excepted effected directly and independently of all other causes through accidental means shall be sustained by a Participant while insured under this Part and shall result [in death].' " *See* 424 Pa. at 109, 225 P.2d at 532.

tan Life policies to exclude situations where death or injury results from acts intentionally performed by the deceased even though those acts were performed without the purpose of inflicting self harm.[10] Therefore, the insurance company's obligation here is governed by the *Beckham* rule, and in the event of death the company must pay the beneficiaries so long as the death was not a suicide or the result of any other excluded cause.

With this background, it is apparent, at least to me, that the district court's charge was fatally deficient because it did not properly instruct the jury regarding the definition of "accidental death" under Pennsylvania law. The jury could have been charged, as plaintiff had requested,[11] that death is deemed to be caused by "accidental means" when a person voluntarily ingests a substance causing his demise, without expecting, foreseeing or anticipating death. Such a charge would have reflected Pennsylvania law under the *Beckham* case, which plaintiff had specifically brought to the court's attention. In view of the plaintiff's request, the trial judge could also have charged that "accidental death" is death that is not purposeful or suicidal, thereby avoiding altogether the use of the potentially confusing words "accidental means." The charge as given, however, seems to have perpetuated the ambiguities of the discredited accidental means-accidental result approach.

The jury was instructed that plaintiff may recover only if death was caused "solely by accidental means;" but the court never clarified the essential point that death occurs "solely by accidental means" even if it results from the intentional ingestion of alcohol and drugs, so long as such items were not consumed for the purpose of self-destruction. The trial court may have attempted to clarify the controlling law when in the course of its charge it instructed the jury that after they establish the cause of death they must then determine whether the substances were taken by Mr. Pollard intentionally "for the *purpose* of self-destruction or for the *purpose* of inflicting serious bodily injury upon himself." But this effort was then undermined by the court's underscoring, an additional four times, that, if there is to be a recovery, death must have been caused through "accidental *means.*" Finally, there was the concluding enigmatic instruction:

Now, even though the facts and circumstances of this case [sic] you find that it is possible to infer that the insured's death resulted from accidental means, *if you also find it is equally plausible to infer that the insured's death resulted from other means such as intentional self-inflicted injury, then your verdict must be for the defendant.* Stated in another way, in this case, there is no burden on the defendant to prove that the insured died from intentional self destruction. Rather, the burden is on the plaintiff to persuade you by a preponderance of the evidence that the insured's death was *solely the result of accidental means.*

In sum, as can be appreciated from a reading of the relevant portion of the jury charge, set forth in the margin,[12] the neces-

---

**10.** As is common in such policies, however, there was an exclusion for death by suicide and for bodily injury that was purposely inflicted. The Metropolitan Life policies provided that "in no case shall any payment be made for death or other loss which is . . . caused by or resulting from intentional self-destruction or intentionally self-inflicted injury, while sane or insane . . . . App. at 40a.

**11.** *See* app. 8a (point 7 of plaintiff's points for charge).

**12.** The jury was instructed:
The plaintiff is not entitled to recover if you do not find by a preponderance of the evidence that her husband's death was caused solely by accidental means. You are instructed that death caused by the ingestion or consumption of drugs or a combination of drugs and alcohol is caused by violent and external means. Bear in mind, however, that the policies in issue do not cover a death which is merely external and violent. It must also be accidental.

The term "accidental" means undesigned, unintended, unexpected, and unpremeditated. The word "accidental" is the antithesis of intention. The concept is further set forth in terms and conditions of the policies in issue as follows: "In no case shall any payment be made for death or any other loss which is

sity for plaintiff to establish death by "accidental *means*" was emphasized and reemphasized, but not once was the jury told that they might return a favorable verdict for the plaintiff if they found that death resulted from the knowing and intentional ingestion of drugs and alcohol, so long as there was no intent to commit suicide. In fact, given the focus on "intentional self-inflicted injury" in a case that did not involve bodily injury in contradistinction to death, the jury may have been led to believe that they must find for the insurance company if they determined that death resulted from Pollard's intentional consumption of drugs and alcohol. Because in my view this charge did not comport with Pennsylvania law, it constituted reversible error.

### B.

There is a second aspect of this case that is also troubling. Plaintiff had sought to introduce into evidence the death certificate, the coroner's report, and the pathologist's necropsy report. In each of these documents the medical examiner or other official who is completing the form is asked what in his judgment was the probable cause of death. In Pollard's case, the answer supplied in each document was "accidental."

The district court refused to allow any of the documents to be introduced into evidence unless the portions dealing with the cause of death were excised. The trial judge apparently based these evidentiary rulings on two grounds. First, he ruled the evidence inadmissible because it conveys an opinion on the ultimate issue in the case. Second, he looked to Pennsylvania law, which does not have a clear rule whether documents prepared at the time of death are admissible to prove the cause of death.[13]

caused by or resulting from intentional self destruction or intentional self-inflicted injury while sane or insane.

In determining whether or not the plaintiff has met her burden, you should first decide the cause of Mr. Pollard's death. The coroner's certificate indicates the death was caused by asphyxiation. If you find that asphyxiation was the result of the ingestion of drugs or drugs and alcohol in harmful quantities, an inference that the consumption of drugs or drugs and alcohol was the cause of death is permissible. If the consumption caused the asphyxiation, then the consumption of the drugs or drugs and alcohol was the cause, or an inference that the consumption of drugs or alcohol was the cause of death, if it causes the asphyxiation. But, this is for you to determine.

You are then required to determine whether or not the substances that caused asphyxiation were intentionally taken by Mr. Pollard for the purpose of self destruction or for the purpose of inflicting serious bodily injury upon himself. In making this decision, you are permitted to consider the fact that there is in human nature, an instinct for self-preservation. But these circumstances does not in and of itself establish the fact that Mr. Pollard died through accidental means. You may regard this as a fact, but must consider all the evidence in determining whether or not Mr. Pollard's death was accidental.

Now, even though from the facts and circumstances of this case you find that it is possible to infer that the insured's death resulted from accidental means, if you also find it is equally plausible to infer that the insured's death resulted from other means such as intentional self-inflicted injury, then your verdict must be for the defendant. Stated in another way, in this case, there is no burden on the defendant to prove that the insured died from intentional self destruction. Rather, the burden is on the plaintiff to persuade you by a preponderance of the evidence that the insured's death was solely the result of accidental means.

If you find that the evidence is evenly balanced on the issue of death by accidental means or death due to non-accidental means, then your verdict must be for the defendant. This is another way of saying that the burden is on the plaintiff to establish the fact that the death in this case was accidental.

**13.** *See* app. 25a, where the court's order denying plaintiff's motion for a new trial indicated that the statements in the documents that attributed death to accidental causes were held to be not admissible because (a) no evidence may be employed to convey to the jury an opinion on the ultimate issue in the case, and because (b) *Lederer v. Metropolitan Life Insurance Company*, 135 Pa.Super. 61, 69, 4 A.2d 608, 613 (1939), expressly reserved opinion on the question whether such statements were admissible.

In affirming the district court, the majority recognizes that the Federal Rules of Evidence, not Pennsylvania law, govern the admissibility of evidence in this case. The Federal Rules operate upon the premise that "[a]ll relevant evidence is admissible,"[14] and indeed declare outright that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[15] Thus, the evidence at issue here was clearly admissible under the Federal Rules, unless there was a countervailing reason for excluding it. The only such reason suggested by the majority is found in Rule 403, which gives the trial judge discretion to exclude any evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, . . . ." The record makes it abundantly clear that this discretion was never exercised. There was no balancing of the probative value of the evidence tendered by plaintiff against any unfair prejudicial effect. Rather, the only references made were to Pennsylvania law regarding the admissibility of such documents and to a rule—different from that found in the Federal Rules of Evidence— that testimony conveying an opinion on the ultimate issue is inadmissible. Nonetheless, the majority asserts that what the trial judge did in this regard was not error. It does so by disregarding the actual basis of the trial judge's ruling and instead by itself engaging in the balancing required by Rule 403, concluding thereby that the district court's ruling was not "manifestly erroneous."

Putting to one side the issue whether the probative value of the evidence in question is outweighed by any unfair prejudicial effect,[16] the role that the majority delegates to itself is somewhat perplexing. The balancing contemplated by Rule 403 is, under the provisions of that rule, clearly to be performed by the trial judge. The reason is that it is the trial judge who is familiar with the evidence and who may examine the parties as to the circumstances surrounding the preparation of the documents and their accuracy, on the one hand, and possible unfair prejudice, on the other.[17] The role of the appellate court in this respect is very limited: the appellate court is to uphold the trial judge's ruling so long as he did not abuse his discretion.[18] Yet, according to the majority, we may affirm a district court *even if it never exercised its discretion,*[19] provided that the district court's result is susceptible to a *post hoc* rationalization, supplied by the court of appeals.

For a number of reasons, I cannot agree with the course of action adopted by the majority in this regard. First, it would appear that the failure of a district court to exercise its discretion is itself an abuse of discretion, even if attributable to an erroneous belief on its part that it is bound by some non-discretionary rule of law.[20] Second, as the Supreme Court has indi-

---

**14.** Fed.R.Evid. 402.

**15.** Fed.R.Evid. 704.

**16.** I do not venture a view whether in fact the tendered evidence should or should not have been excluded on the basis of a balancing under Rule 403, but should like to point out that the outcome is not foreordained. In any event, I do not believe that a ruling admitting the evidence in question would have been reversed as being "manifestly erroneous."

**17.** *See United States v. Long,* 574 F.2d 761, 767 (3d Cir. 1978).

**18.** *See, e. g., United States v. Dwyer,* 539 F.2d 924, 927 (2d Cir. 1976).

**19.** Needless to say, this is not a case where the district judge actually balanced under Rule 403 but failed to set forth the reasons supporting the manner in which he exercised discretion, *see United States v. Long,* 574 F.2d 761, 768–72 (3d Cir. 1978) (Adams, J., concurring).

**20.** *See* Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635, 666 (1971), where the author quotes this passage from *Grow v. Wolcott,* 123 Vt. 490, 492, 194 A.2d 403, 404 (1963):

[W]here a party has called upon the court for a discretionary ruling, it is improper for the court to refuse to utilize its right to decide the question as a matter of discretion. Purporting to be bound to [a] rule as a matter of

cated, it is improper for a court of appeals to undertake "a *de novo* examination of the record and itself [exercise] the discretionary function which the rule commits to the trial judge."[21] Rather, "[t]he function of the Court of Appeals in this case was to determine the appropriate criteria and then leave their application to the trial judge on remand."[22] Finally, *post hoc* rationalizations are always suspect, and in other contexts have been held not to be acceptable substitutes for reasoned decisionmaking in the first instance.[23] I fail to see how this case is any different, particularly since here the rationalization has not even been provided by the original decisionmaker, but instead by a reviewing tribunal. Inasmuch as the exclusion of the evidence that was tendered in the present case cannot be said to have been harmless error, the proper course in my view would be to remand the case for a new trial.

Accordingly, I respectfully dissent.

---

law will not satisfy the moving party's claim on the court's discretion.
   *See also Schulty v. Cally,* 528 F.2d 470, 476 (3d Cir. 1975); *In. Re Grand Jury Proceedings (Schofield II),* 507 F.2d 963, 972 (3d Cir.) (Aldisert, J., dissenting), *cert. denied sub nom. Schofield v. United States,* 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975).

21. *Platt v. Minnesota Mining & Manufacturing Co.,* 376 U.S. 240, 245, 84 S.Ct. 769, 772, 11 L.Ed.2d 674 (1964), (court of appeals improper

ly ordered transfer of a multi-venue case where discretion was vested in the district court pursuant to Fed.R.Crim.P. 21(b)).

22. *Id.*

23. *See, e. g., SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Tabor v. Joint Board for Enrollment of Actuaries,* 185 U.S.App.D.C. 40, 44–47, 566 F.2d 705, 709–12 (1977) (agency actions cannot be sustained on the basis of *post hoc* rationalizations supplied during judicial review).